**MADE JS-6**

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LUIS A.G. MUJICA, et al., | ) No. CV 03-2860-GW(JWJx) |
| Plaintiffs, | ) **RULING ON LIMITED REMAND AS TO** |
| v. | ) **THE PRUDENTIAL EXHAUSTION ISSUE** |
| OCCIDENTAL PETROLEUM, et al. | ) |
| Defendants. | ) |

*Mujica v. Occidental Petroleum*, Case No. CV-03-2860
Ruling on Limited Remand as to the Prudential Exhaustion Issue

## I. INTRODUCTION

This matter is before this court pursuant to a mandate issued by the Ninth Circuit in Mujica v. Occidental Petroleum Corp., 564 F.3d 1190 (9th Cir. 2009) ("Mujica II"), on an appeal from a June 28, 2005 decision by Judge William J. Rea in Mujica v. Occidental Petroleum Corp., 381 F. Supp. 2d 1164 (C.D. Cal. 2005) ("Mujica I"). The Ninth Circuit mandate reads, in its entirety:

> ORDER
>
> In light of the intervening authority of Sarei v. Rio Tinto, 550 F.3d 822 (9th Cir. 2008) (en banc), this case is remanded to the district court to consider whether a prudential exhaustion requirement applies in this case, and if so, whether that requirement bars any claims in this case. On remand, the district court should also consider the effect, if any, of the decision of the Council of State of the Republic of Colombia in Mario Galvis Gelves, et al. v. The Nation, slip op. (Council of State, Rep. of Colombia, Ad. Law Div., Sec. 3, Dec. 13, 2007) and the decision of the Court No. 12 for Criminal Matters of the Circuit of Bogot [sic] of the Republic of Colombia in In re Cesare Romero Pradilla, et al., slip op. (Sept. 21, 2007).
>
> REMANDED.

Mujica II, 564 F.3d at 1192.

## II. FACTUAL BACKGROUND

Judge Rea summarized the factual allegations regarding the conduct giving rise to plaintiffs' alleged injuries as follows:

> The instant case arises from a bombing that occurred in Santo Domingo, Colombia on December 13, 1998. In 1998, Plaintiffs lived in Santo Domingo. The Defendants, Occidental Petroleum Corp. ("Occidental") and AirScan, Inc., are both American companies; the former is located in Los Angeles, the latter in Florida. Defendant Occidental operates, as a joint venture with the Colombian government, an oil production facility and pipeline in the area of Santo Domingo.
>
> Plaintiffs allege the following relevant facts. Since 1997, Defendant AirScan has provided security for Defendant Occidental's oil pipeline against attacks from left-wing insurgents. Prior to 1998, Defendants worked with the Colombian military, providing them with financial and other assistance, for the purpose of furthering Defendant Occidental's commercial interests. On

several occasions during 1998, Defendant Occidental provided Defendant AirScan and the Colombian military with a room in its facilities to plan the Santo Domingo raid. Defendant AirScan and the Colombian Air Force ("CAF") carried out this raid for the purpose of providing security for Defendant Occidental (i.e., protecting its oil pipeline) and was not acting on behalf of the Colombian government. During the raid, three of Defendant AirScan's employees, along with a CAF liaison, piloted a plane with CAF markings that was paid for by Defendant Occidental. From this airplane, Defendant AirScan provided aerial surveillance for the CAF, helping the CAF identify targets and choose places to deploy troops.

On December 13, 1998, residents of Santo Domingo saw low-flying CAF helicopters overhead and attempted to communicate that they were civilians by lying down on the road and covering their heads with white shirts. Soon thereafter, several witnesses saw an object (or several objects) drop from one of the CAF helicopters. One of the cluster bombs dropped by the CAF exploded directly in the town of Santo Domingo, destroying homes and killing seventeen civilians and wounding twenty-five others. Of the seventeen killed, six were children. During the attack, the CAF helicopters knowingly fired on civilians attempting to escape and on those who were trying to carry the injured to a medical facility. Soon thereafter, other CAF troops entered the town, blocked civilians from leaving, and ransacked their homes.

While the purpose of the Santo Domingo raid was to protect Defendant Occidental's pipeline from attack by left-wing insurgents, no insurgents were killed in the attack. These insurgents were located at least one to two kilometers outside of the Santo Domingo. Defendants knew that the insurgents were not in Santo Domingo but carried out the attack nonetheless.

Mujica I, 381 F. Supp. 2d at 1168 (citations to First Amended Complaint ["FAC"] omitted).

### III. PROCEDURAL BACKGROUND

Plaintiffs' FAC contained causes of action under the Alien Tort Statute ("ATS") (28 U.S.C. § 1350), the Torture Victim Protection Act of 1991 ("TVPA") (106 Stat. 73, see Historical and Statutory Notes following 28 U.S.C.A. § 1350), and state law claims for wrongful death, intentional infliction of emotional distress, negligent infliction of emotional distress, and violation of California Business and Professions Code § 17200. Mujica I, 381 F. Supp. 2d at 1169.

Pursuant to a request by Defendant Occidental Petroleum Corp. ("Occidental"), Judge Rea solicited the views of the United States Department of State regarding the potential foreign policy implications of this action. Id. On December 30, 2004, the State Department filed a Supple-

mental Statement of Interest ("Supplemental Statement") stating its opinion that pursuit of the instant litigation would severely impact this country's diplomatic relationship with Colombia. Id. A letter from the Colombian government indicating that it opposed this litigation was attached to the Supplemental Statement. Id.

Occidental moved to dismiss the action pursuant to Fed. R. Civ. Proc. 12(b)(6). Judge Rea dismissed portions of Plaintiffs' case on various grounds, but also dismissed the entire case "pursuant to the political question doctrine" concluding that "the instant action . . . rais[ed] a non-justiciable political question." Id., 381 F. Supp. 2d at 1168 and 1195.

On July 11, 2005, Plaintiffs filed a Notice of Appeal. See Docket No. 112. Prior to the filing of that appeal, a Ninth Circuit panel had issued a decision in Sarei v. Rio Tinto, PLC, 487 F.3d 1193 (9th Cir 2007) ("Sarei I"), which in part reversed a district court's dismissal of numerous ATS claims as being barred by the political question doctrine. In doing so, the majority also held that the ATS did not require exhaustion of local remedies. Id. at 1223. However, a rehearing en banc was granted in Sarei I and on April 12, 2007, in a splintered decision six judges concurred in a limited remand of the case to the district court to consider whether to impose a "prudential" exhaustion requirement. Sarei v. Rio Tinto, PLC, 550 F.3d 822, 832 (9th Cir. 2008) ("Sarei II").

On May 11, 2009, the Ninth Circuit remanded this case in light of the en banc decision in Sarei II. Mujica II, 564 F.3d at 1192.

## IV. DISCUSSION

### A. An Initial Point of Confusion

The Ninth Circuit's order of remand is confusing in light of: (1) the fact that all of the claims in this case were dismissed at least on the basis of their being non-justiciable under the political question doctrine, and (2) the holding in Sarei II, 550 F.3d at 828, that "[j]udicially-imposed or prudential exhaustion is not a prerequisite to the exercise of jurisdiction, but rather is 'one among related doctrines - including abstention, finality, and ripeness - that govern the timing of federal court decisionmaking.' McCarthy v. Madigan, 503 U.S. 140, 144 (1992) . . . ." The specific instruction of the Circuit is for this court "to consider whether a prudential exhaustion requirement applies in this case, and if so, whether that requirement bars any claims in this case." Mujica II, 564 F.3d at 1192. However, as held in Corrie v. Caterpillar, Inc., 503 F.3d 974, 980-81 (9th Cir. 2007):

> The Supreme Court has indicated that disputes involving political questions lie outside of the Article III jurisdiction of federal courts. See Schlesinger v. Reservists Comm. To Stop the War, 418 U.S. 208, 215 (1974) . . . No GWEN Alliance of Lane County, Inc. v. Aldridge, 855 F.2d 1380, 1382 (9th Cir. 1988) ("[T]he presence of a political question precludes a federal court, under [A]rticle III of the Constitution, from hearing or deciding the case presented."). Federal courts' jurisdiction is constrained by Article III of the Constitution. Because the political question doctrine curbs a court's power under Article III to hear a case, the doctrine is inherently jurisdictional. [Citations and footnote omitted.]

In light of the above, this court would initially (but very respectfully) wonder why it is being asked to consider whether a prudential, but non-jurisdictional, precept is applicable when its predecessor judicial officer has already dismissed all of Plaintiffs' claims on the expressed jurisdictional ground of the political question doctrine.¹ Moreover, even if this court were to find the prudential exhaustion precept applicable in this case, it could not order its application herein because this court would not have jurisdiction over the case anyway, at least until the prior ruling as to the political question doctrine has been reversed.² Furthermore, certain of Judge Rea's

---

¹ It may be that the political question doctrine has been interpreted by some as not referring to a jurisdictional bar but merely as a form of prudential limitation to a court's exercise of its jurisdiction. But see the above quoted language from Corrie, as well as 503 F.3d at 981 ("the political question doctrine may have a prudential element to its application, and it is not a contradiction to speak of the political question doctrine as both prudential and jurisdictional. But it is at bottom a jurisdictional limitation imposed on the courts by the Constitution, and not by the judiciary itself.").

Furthermore, assuming arguendo that the political question and the prudential exhaustion doctrines are both merely prudential and not jurisdictional, why would the latter be entitled to any primacy in regards to consideration and/or applicability? The plurality in Sarei II notes that "a federal court has leeway to choose among threshold grounds for denying audience to a case on the merits," citing Sinochem Int'l v. Malaysia Int'l Shipping Corp., 549 U.S. 422, 431 (2007). See 550 F.3d at 825 n.1. It then goes on to state that "exhaustion stands on different footing than a decision, for example, on political question or act of state grounds. As a prudential matter, in this case there is a certain logic to considering exhaustion before considering threshold grounds that may 'deny[] audience to a case on the merits.'" Id. There is no explanation for that statement/conclusion and the "logic" does not appear to be self-evident. A decision dismissing a claim on the basis of the political question doctrine would not "deny audience to a case on the merits." Moreover, the exhaustion analysis requires a number of steps which can include making difficult determinations of the law and remedies (and the shifting status of those laws and remedies) in the foreign country. The political question doctrine rests firmly on the federal laws of this nation with which the federal courts are already familiar. Further, the Supreme Court's decision in Sosa v. Alvarez-Machain, 542 U.S. 692 (2004), which the plurality in Sarei II used as its "starting point," in the very footnote relied upon by the plurality, noted the existence of "a policy of case-specific deference to political branches." In such situations, the Supreme Court noted that "there is a strong argument that federal courts should give serious weight to the Executive Branch's view of the case's impact on foreign policy." 542 U.S. at 733 n.21.

In addition, if courts in the United States decide under the United States Constitution not to entertain claims involving foreign sovereign states, what would be the purpose of determining whether the plaintiffs should be required to first exhaust the remedies purportedly available in the foreign country when, regardless of the outcome of that exhaustion, they will not at any point be permitted to litigate their claims in this country because of the political question doctrine? In other words, if the political question doctrine applies to the case, prudential exhaustion of the foreign country's local remedies becomes irrelevant because the plaintiffs would be barred from litigating in the United States irrespective of their having exhausted or not.

² In Sarei I, the majority in the original three judge panel decision initially ruled that "none of the plaintiffs' claims present nonjusticiable political questions" and reversed the "district court's dismissal on that ground . . . ." 487 F.3d at 1208. When the case was taken en banc, that ruling on the political question doctrine issue was not raised. Thus, when the en banc plurality remanded the case back to the

findings and rulings in his consideration of the political question doctrine and other issues are involved to some degree in the consideration of the applicability of prudential exhaustion to this case. It is unclear exactly how this court is now to treat those findings/rulings.

Despite the above and in light of the Circuit's mandate, to paraphrase Tennyson, "ours not to reason why, ours but to do and die."[3]

### B. Which Claims Should Be Subject to the Analysis

#### 1. Claims Already Dismissed on Their Merits

There is an initial question whether this court should undertake a prudential exhaustion analysis of all of the claims that were asserted by Plaintiffs, or just of those claims that were not dismissed on the merits. Occidental reasons fairly persuasively that the appellate court's mandate - notwithstanding its reference to "any" claims in this case - only requires consideration of the exhaustion issue with respect to claims that were dismissed pursuant to the political question doctrine. With respect to Plaintiffs' claims that were considered and dismissed on their merits, a prudential exhaustion analysis would appear to be superfluous - it would serve no purpose to require Plaintiffs to exhaust meritless claims (which in any event could not satisfy the second prong of the two-prong test for prudential exhaustion, see infra). Put another way, the apparent rationale for considering prudential exhaustion before dismissal pursuant to the political question doctrine (i.e., that the latter prevents claims from being heard on the merits) does not apply to claims that have already been considered on their merits.

Following the district court's lead in Sarei v. Rio Tinto PLC, 650 F. Supp. 2d 1004, 1013 (C.D. Cal. 2009) ("Sarei III"), this court's inquiry in this matter should, then, first proceed by "determin[ing], as an initial threshold inquiry, whether it [is] appropriate to impose a prudential exhaustion requirement" with respect to the ATS claims that were asserted in this case. Then, if this court finds that a prudential exhaustion requirement should be imposed, "it [sh]ould conduct the traditional two-step exhaustion analysis," by asking whether the plaintiffs had local remedies and exhausted them and, if not, whether exhaustion would be futile. See id.[4] Although Defendants contend that the 9th Circuit's opinion in Cassirer v. Kingdom of Spain, 580 F.3d 1048 (9th Cir. 2009), "confirms beyond doubt that the Sarei district court erred in concluding . . . that the question whether to apply a prudential exhaustion requirement should be decided ahead of, and apart from, the question whether remedies were available in the foreign forum," Opp. 11, n.5,

---

district court for a consideration of prudential exhaustion, there had been no discussion of the political question doctrine as being a jurisdictional consideration and, in fact, it was noted that the majority in the three judge panel had held that the district court had subject matter jurisdiction under the ATS. See 550 F.3d at 826.

[3] Alfred, Lord Tennyson - The Charge of the Light Brigade.

[4] It is noted that, in Sarei III, the district court concluded that the matter would then be returned to the circuit court "so that the appellate court would have a full and complete record in deciding whether plaintiffs should be required to pursue local remedies as to any claim." Id., 650 F. Supp. 2d at 1013-14.

that contention is inaccurate herein for at least three reasons. First, the <u>Cassirer</u> opinion is, as of December 30, 2009, unciteable as precedent because it has been taken en banc. See <u>Cassirer v. Kingdom of Spain</u>, 590 F.3d 981 (9th Cir. 2009) (granting en banc review, though presumably on other grounds).[5] Second, the Ninth Circuit's mandate in this case asks this court first to consider whether a prudential exhaustion applies in this case and then whether any claims must be exhausted. The <u>Cassirer</u> approach, which essentially collapses these two separate inquiries, would be contrary to the instructions of the Ninth Circuit. Third, in <u>Sarei II</u>, where the "framework" for the evaluating prudential exhaustion in ATS cases was delineated, the court first addressed the areas of weak versus strong "nexus" and the presence of matters of "universal concern" before turning to that described framework. See 550 F.3d at 828-32.

### 2. Plaintiffs' TVPA Claims

The TVPA has an express exhaustion requirement. See 106 Stat. 73 at Section 2(b) ("A court shall decline to hear a claim under this section if the claimant has not exhausted adequate and available remedies in the place which the conduct giving rise to the claim occurred."). Given the existence of the exhaustion requirement in the statute itself, finding an prudential exhaustion requirement as to TVPA claims would be unnecessary.[6]

### C. The Applicability of Prudential Exhaustion to Plaintiffs' ATS Claims

The plurality opinion in <u>Sarei II</u>, 550 F.3d at 824 states:

> Although we decline to impose an absolute requirement of exhaustion in ATS cases, we conclude that, as a threshold matter, certain ATS claims are appropriately considered for exhaustion under both domestic prudential standards and core principles of international law. Where the "nexus" to the United States is weak, courts should carefully consider the question of exhaustion, particularly - but not exclusively - with respect to claims that do not involve matters of "universal concern." Matters of "universal concern" are offenses "for which a state has jurisdiction to punish without regard to territoriality or the nationality of the offenders." [Citation and footnote omitted.]

---

[5] Were there any suggestion that en banc review was granted in <u>Cassirer</u> for the Ninth Circuit to clarify how to conduct a prudential exhaustion analysis, this matter should be stayed.

[6] Judge Rea acknowledged the statutory exhaustion requirement but declined to rule on Defendant Occidental's arguments that Plaintiffs had failed to exhaust the available remedies because he found that the TVPA only provided for liability as to an "individual" and hence a TVPA claim could not be made against Occidental which is a corporation. <u>Mujica I</u>, 381 F. Supp. 2d at 1171 n. 2.

1. <u>Nexus to the United States</u>

Here, the parties disagree as to whether there is such a weak nexus to the United States that this court should consider exhaustion. (Occidental, of course, also disputes that this is a threshold question). Occidental argues that, because Plaintiffs are seeking to impose secondary liability for "an incident allegedly committed by the Columbian Air Force against Columbian citizens on Columbian soil that has already been adjudicated by the Columbian Courts," the lawsuit has <u>no</u> nexus to the United States. This argument overreaches.

In <u>Sarei II</u>, the plurality opinion expressly relies on the Restatement (Third) Foreign Relations Law of the United States ("Restatement") to discern the "traditional bases for exercising our sovereign jurisdiction to prescribe laws, namely nationality, territory, and effects within the United States."[7] See <u>Sarei II</u>, 550 F.3d at 831. Restatement § 402 provides:

> Subject to § 403, a state has jurisdiction to prescribe law with respect to
>
> (1) (a) conduct that, wholly or in substantial part, takes place within its territory;
>
> (b) the status of persons, or interests in things, present within its territory;
>
> (c) conduct outside its territory that has or is intended to have substantial effect within its territory;
>
> (2) <u>the activities, interests, status, or relations of its nationals outside as well as within its territory</u>; and
>
> (3) certain conduct outside its territory by persons not its nationals that is directed against the security of the state or against a limited class of other state interests. [Emphasis added.]

---

[7] Although the district court in <u>Sarei III</u> did utilize the Restatement § 402 factors in evaluating the strength/weakness of the nexus to the United States element, it was observed that:
> None of the concurring or dissenting members of the [Sarei II] en banc panel endorsed or joined in [the plurality's] analysis regarding the weight to be afforded the Restatement factors in evaluating nexus. Consequently, it does not appear that [Judge McKeown's] views regarding the subject are binding on remand. See, e.g., <u>Alperin</u>, 410 F.3d 532, 552 n. 13 ("Abiding by the rule that when 'no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds . . . .'"

See 650 F. Supp. 2d at 1017 n.27.

Restatement § 403 counsels that, even when the bases for jurisdiction are present, the following factors should be considered to decide whether the exercise of jurisdiction would be unreasonable:

> (a) the link of the activity to the territory of the regulating state, i.e., the extent to which the activity takes place within the territory, or has substantial, direct, and foreseeable effect upon or in the territory;
>
> (b) the connections, such as nationality, residence, or economic activity, between the regulating state and the person principally responsible for the activity to be regulated, or between that state and those whom the regulation is designed to protect;
>
> (c) the character of the activity to be regulated, the importance of regulation to the regulating state, the extent to which other states regulate such activities, and the degree to which the desirability of such regulation is generally accepted;
>
> (d) the existence of justified expectations that might be protected or hurt by the regulation;
>
> (e) the importance of the regulation to the international political, legal, or economic system;
>
> (f) the extent to which the regulation is consistent with the traditions of the international system;
>
> (g) the extent to which another state may have an interest in regulating the activity; and
>
> (h) the likelihood of conflict with regulation by another state.

Id., § 403(2).

As argued by the plaintiffs in Sarei III, however, any analysis of the sufficiency of nexus in such a circumstance "must be made with the understanding that every ATS case will involve claims by an alien for a tort committed in violation of the law of nations." 650 F.Supp. 2d at 1015. Indeed, the Ninth Circuit has observed that courts "are constrained by what [the ATS] shows on its face: no limitations as to the citizenship of the defendant, or the locus of the injury." In re Estate of Ferdinand E. Marcos Human Rights Litigation, 978 F.2d 493, 500 (9th Cir. 1992). Thus, the district court in Sarei III concluded:

> "[N]exus" is most sensibly evaluated in the ATCA context by consideration of a spectrum or range (weakest to strongest) of contacts or connections, not as an absolute. In assessing where on that spectrum a particular ATCA case falls, courts should consider the Restatement factors outlined above, other pertinent connections between the United States and the parties and/or claims, and the scope and purpose of the ATCA itself.

650 F. Supp. 2d at 1016.

In contrast to Sarei III, where the district court, upon remand, found a weak nexus between the plaintiffs' claims and the United States, here, both Occidental and U.S. Airscan are U.S. corporations. Plaintiffs also point out that the lead plaintiff, Luis Alberto Galvez Mujica, was lawfully residing in the United States at the time this action was filed. (All three plaintiffs now apparently reside in Canada). Plaintiffs also assert that the United States has condemned the actions by the CAF that are at issue in this case. Moreover, the CAF unit allegedly involved in the incident may have been receiving American aid. See Order Denying Defendant's Motion to Dismiss the Action under the Doctrines of Forum Non Conveniens and International Comity (Docket No. 109).

While, presumably the required nexus between the claims and the United States must be stronger than the nexus between a defendant's contacts and claims that would support the exercise of personal jurisdiction, there is a sufficiently strong nexus between the claims asserted in this lawsuit and the United States that local exhaustion should not be required. Moreover, even if the nexus were held to be weak, as discussed below, Occidental has not shown that the claims in this case do not implicate matters of universal concern.

### 2. Matters of Universal Concern

In arguing that this case does not raise a matter of universal concern, Occidental focuses almost exclusively on its argument that Plaintiffs' lawsuit against Defendants is premised upon a theory of secondary liability, i.e. "civil aiding and abetting liability." However, Judge Rea expressly found (with respect to Plaintiffs' TVPA claims) that "Plaintiffs are not asserting that Occidental was aiding or abetting the actions of the Columbian military," but rather was involved in a joint venture and/or conspiracy to carry out the alleged attacks. See Mujica I, 381 F. Supp. 2d at 1172. Certainly, Defendants have not offered any case that directly suggests that the distinction between primary and secondary liability is critical enough to determine whether a claim involves a matter of universal concern. Rather, they simply assert their own conclusion that the district court in Sarei III "wrongly found the 'universal concern' factor to be satisfied based largely upon the underlying wrongful conduct, without considering whether the conduct of the particular allegedly secondarily-liable defendants implicated matters of universal concern." Reply 24 n. 19.

Sarei III's definition of "matters of universal concern" - i.e., "offenses for which a state has jurisdiction to punish without regard to territoriality or the nationality of the offenders" - rests upon the decision in Kadic v. Karadzic, 70 F.3d 232, 240 (2nd Cir. 1995), and the Restatement § 404. See 650 F. Supp. 2d at 1020-21. Occidental correctly observes that it cannot be the case, for example, that the "jurisdiction" question can be answered merely by reference to whether the alleged claim states a violation of international law, because otherwise every ATS claim would, by definition, present a matter of universal concern (and therefore possibly be exempt from the exhaustion requirement). Nevertheless, Occidental has not offered any argument that the alleged conduct of the CAF/Defendants as delineated by the Plaintiffs in this case does not involve a matter of "universal concern," nor any real argument that "a state" would lack jurisdiction to punish joint-venturers or co-conspirators "without regard to their territoriality or nationality."

Restatement § 404 provides that:

> A state has jurisdiction to define and prescribe punishment for certain offenses recognized by the community of nations as of universal concern, such as piracy, slave trade, attacks on or hijacking of aircraft, genocide, war crimes, and perhaps certain acts of terrorism, even where none of the bases of jurisdiction indicated in § 402 is present.

As stated in the "Comments" to Section 404:

> *Expanding class of universal offenses.* This section, and the corresponding section concerning jurisdiction to adjudicate, § 423, recognize that international law permits any state to apply its laws to punish certain offenses although the state has no links of territory with the offense, or of nationality with the offender (or even the victim). Universal jurisdiction over the specified offenses is a result of universal condemnation of those activities and general interest in cooperating to suppress them, as reflected in widely accepted international agreements and resolutions of international organizations. These offenses are subject to universal jurisdiction as a matter of customary law. Universal jurisdiction for additional offenses is provided by international agreements, but it remains to be determined whether universal jurisdiction over a particular offense has become customary law for states not party to such an agreement. * * * *
>
> Universal jurisdiction is increasingly accepted for certain acts of terrorism, such as assaults on the life or physical integrity of diplomatic personnel, kidnapping, and indiscriminate violent assaults on people at large.

Plaintiffs have alleged actions which can be said to fall within the category of war crimes and indiscriminate violent assaults on people at large. See Sarei III, 650 F. Supp. 2d at 1023. Therefore, this court would conclude that Occidental has not shown that those claims against Defendants in this case are likely to be subject to an exhaustion requirement.

### D. Availability of Local Remedies

Normally, the first step in an exhaustion analysis would be whether the defendant has pled and justified an exhaustion requirement, including the availability of local remedies. Sarei II, 550 F.3d at 832. Here, there is no dispute that Defendants raised exhaustion as an affirmative defense. Assuming Occidental had met its burden with respect to the threshold showing of whether exhaustion should be required, this court would then ask whether it has succeeded in demonstrating the availability of local remedies to Plaintiffs. It is probably at this point that the Ninth Circuit intended consideration of the Galvis Gelves and Romero Padilla matters to come into play.[8]

---

[8] Galvis Gelvis was a civil administrative action against "the Nation [of Colombia], Ministry of Defense, National Army and Columbian Air Force" for damages resulting from the events forming the

The availability of local remedies was already extensively considered by Judge Rea in this case in the context of Defendants' motion to dismiss on grounds of forum non conveniens. In his ruling on that motion, Judge Rea found that the proposed alternative forum of Columbia was inadequate based on the fact that plaintiffs had obtained a judgment in Columbia which was deemed "complete relief," even though the Defendants in this action were not parties to the Colombian proceeding. Mujica I, 381 F. Supp. 2d at 1148. Judge Rea wrote that "[i]f Plaintiffs already have received complete recovery for their injuries through the Colombian court system," then unless that judgment were disturbed, "Colombia would be an inadequate forum because Plaintiffs could not obtain a remedy against Defendant as they could in this Court." Id.

Defendants argue that the above analysis is not necessarily binding on this court, because the Ninth Circuit has instructed us to consider remedies that are currently available. Although it seems more likely, as Plaintiff argues, that exhaustion should be assessed as of the time the lawsuit was filed, it would be difficult to make sense of the Ninth Circuit's direction to consider the Galvis Gelves and Romero Padilla matters if that were the case. Regardless, if this court were to reach this step, the outcome would be the same whether availability of local remedies is assessed as of now or as of 2003 when the case was filed. Defendants also argue that Judge Rea, to the extent that his Order must be read as holding that a legal system that does not allow double recovery is inadequate, was probably wrong in his assessment of the adequacy of local remedies. (Indeed, Plaintiffs here do not repeat the argument that Judge Rea relied on in making his ruling, because they too appear to reject its premise).

With this in mind, Occidental seems to have met its initial burden of showing the availability of local remedies. Occidental's expert, Dr. Fernando Hinestrosa, has stated that Plaintiffs could bring a suit against Occidental today in Colombia, and could have brought one in September 2000, or at any time in between. See Hinestrosa Decl. (Exh. E to Cachan Decl.) ¶¶ 56-57. Occidental has consented to jurisdiction in Colombia, and the statute of limitations under Colombian law has not yet run. Hinestrosa Decl. ¶ 58. Hinestrosa has also testified regarding the availability of pendent party jurisdiction in Plaintiffs' suit against the Columbian government. Plaintiffs dispute this point, and have, in fact, shown that claims in Administrative Courts (such as the claim in Galvis Gelves) may only be brought against the government. See Oct. 2004 Gaitan Decl. (Ex. 1 to current Gaitan Decl.) ¶ 5. Occidental notes, however, that even if pendent party jurisdiction were unavailable, it does not explain why Plaintiffs could not have proceeded in a separate suit against the Defendants herein.

Plaintiffs complain that Occidental's expert "merely discusses a 'hypothetical civil lawsuit' and never addresses the real, practical, and prohibitive barriers that such an action would have faced in Columbia." Resp. 15:19-21. To wit, Plaintiffs argue that it would have been impossible "as a practical matter" for them to bring suit against Occidental or Airscan in 2003 because the Airscan employees who were responsible for its wrongful acts fled the country, apparently thwarting their criminal prosecution. See Gaitan Decl. ¶¶ 6 - 7. Plaintiffs then appear to argue that, under the Columbian legal system, such a criminal action would have been a necessary prerequisite to a civil suit, but even their own expert declarations do not to support this

---

basis for this lawsuit. Romero Pradilla was a criminal case against the military officers who had a role in those events.

-11-

contention. Rather, as Occidental observes, those declarations merely show that, under Colombian law, (1) a criminal conviction of an employee may serve as a basis for filing an action for civil damages against the employing entity in civil court, and (2) that, in certain circumstances, an injured party may elect to pursue damages "within the criminal proceeding." It is noted that Plaintiffs have not identified any employee of Occidental who left Columbia or who would have been subject to criminal charges there.

Having only weakly tried to refute Occidental's showing regarding the availability of local remedies, Plaintiffs primarily focus on attempting to demonstrate that exhaustion would be futile because they would face physical danger if they returned to Columbia to initiate legal proceedings. Here, this court would again refer to Judge Rea's order on the forum non conveniens motion, which refers to the substantial evidence that was submitted by Plaintiffs regarding the danger they would face. Judge Rea also noted that the fact that Plaintiffs did successfully pursue a lawsuit against the Columbian government does not negate their futility argument - in fact, Plaintiffs' contention in opposing the forum non conveniens motion was that they first started to fear for their safety after they filed suit in Columbia.

Occidental has, however, at least partly refuted some of Plaintiffs' contentions regarding the threats to their physical safety. Occidental notes that Plaintiffs did pursue a suit in Colombia for years, filed court papers in Colombia with names, addresses, and telephone numbers, and that two of the Plaintiffs posed for photos in connection with a 2003 newspaper interview in Colombia. Plaintiffs remained in Colombia for many years after initiating suit there; and Plaintiff Galvis Mujica traveled to Colombia while this case was pending. Moreover, even if Plaintiffs faced threats in Santo Domingo, they could file suit against Occidental in Bogotá, the country's capital. See Sept. 2009 Hinestrosa Decl. (Ex. A to McEvoy Decl.), ¶ II.B.1.

Occidental correctly observes, moreover, that Plaintiffs have not shown that their "physical presence in [Columbia] is required to pursue the civil action." Argueta v. Banco Mexicano, S.A., 87 F.3d 320, 327 (9th Cir. 1996). Occidental contends (1) that the viability of Plaintiffs' lawsuit turns on a threshold legal issue - i.e., whether the conclusion of Plaintiffs' suit against the Columbian government bars any further recovery from the defendants in this action - the resolution of which does not depend on Plaintiffs' physical presence, and (2) that, even if full-blown litigation is necessary, Plaintiffs' physical presence in Columbia would not be required. See Feb. 2005 Hinestrosa Decl. (Ex. H to Cachan Decl.) ¶¶ 24-31.

Plaintiffs also argue that Occidental wields such enormous power and influence in Columbia that it would not be possible for them to obtain meaningful justice against the company in Columbia. As Occidental observes, in light of considerations of comity, a party claiming such inadequacy must make a "powerful showing." Tuazon v. R.J. Reynolds Tobacco Co., 433 F.3d 1163, 1179 (9th Cir. 2006). Such a showing has not been made here.

If exhaustion were required, Occidental would probably prevail on its demonstration of the availability of local remedies and the lack of futility. Having decided that local remedies were available and that Plaintiffs failed to exhaust them, this court would then be required to ask whether it should impose or waive exhaustion in light of such factors as: (a) the need to safeguard international comity; (b) the existence or lack of nexus with the United States; (c) the gravity of potential violations of international law; and (d) whether the allegations involve matters of universal concern. According to the Sarei II opinion, these questions are motivated by - and

encompass - comity concerns. See 550 F.3d at 830-31. But the Ninth Circuit's order of mandate's reference to the two Columbia cases suggests that comity should also be considered separately.

The fact that the effect of the Columbia civil and criminal judgments might have to be addressed in the current litigation does not raise such concerns about comity that this court should impose an exhaustion requirement. Courts in the United States can and do consider the effects of foreign judgments. In this case, the question whether the judgment in Galvis Gelves might bar Plaintiffs' claims in this litigation is, as Occidental argues, a threshold question that would have to be addressed should the Ninth Circuit reverse any of Judge Rea's orders dismissing Plaintiffs' claims on other grounds. Based on the above discussion, it is not a critical question in the exhaustion analysis per se - especially in light of the tentative conclusion that exhaustion would not be required in this case.

## V. CONCLUSION

Based on the foregoing discussion, this Court would find that it would not impose a prudential exhaustion requirement in this case. Were it to impose such a requirement, it would find that Defendant Occidental has met its burden of pleading and proving the availability of local remedies and Plaintiffs' failure to exhaust them. Plaintiffs have not met their shifted burden of showing that exhaustion would be futile, although on this point it is rather a close call. Neither the Galvis Gelves decision nor the Romero Padilla decision significantly affects the prudential exhaustion analysis.

Dated: This 8th day of March, 2010.

                                                              GEORGE H. WU
                                                        United States District Judge